**Ronald B. BRASS, Frederick Teper, Plaintiffs,**

**v.**

**Solomon HOBERMAN, Director of Personnel, New York City Department of Personnel and Chairman, New York City Civil Service Commission, Milton Samorodin, James Smith, Members, New York City Civil Service Commission, Defendants.**

No. 68 Civ. 2993.

United States District Court
S. D. New York.

Dec. 12, 1968.

Alan H. Levine, Martin M. Berger, Martin Gerry, New York City, for plaintiffs.

J. Lee Rankin, Corp. Counsel, for defendants; Irwin L. Herzog, New York City, of counsel.

## OPINION

HERLANDS, District Judge:

Plaintiffs have moved, pursuant to Fed.R.Civ.P. 65(a), for a preliminary injunction (1) to restrain defendants from declaring plaintiffs ineligible for civil service employment as caseworkers with the New York City Department of Social Services and from removing their names from the eligible lists and (2) to direct defendants to certify that plaintiffs are eligible for such employment.

Jurisdiction is based on 28 U.S.C. § 1343(3), (4) (1964), plaintiffs claiming that they have been found "not qualified" for the position of caseworker on the basis of an unconstitutionally discriminatory policy and by means of procedures that do not measure up to the standards imposed by the due process clause of the fourteenth amendment.

The Court declines at this time to issue the preliminary injunction sought but, pursuant to Fed.R.Civ.P. 65(a) (2), orders that the trial on the merits be advanced, as detailed below. This opinion contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

*Administrative Proceedings concerning Brass*

Plaintiff Brass applied for employment as a caseworker. On February 24, 1967, he was advised that he had passed the written and medical examinations administered to him, in connection with his application, on February 7, 1967.

In June, 1967, Brass was requested to appear to take a special medical examination to be administered June 20, 1967.

On July 6, 1967, he was sent a notice of proposed disqualification based on his failure to meet the medical requirements, "as a result of the special medical exam on 6/20/67." Thereafter Brass corresponded with the Department of Personnel, in the main protesting his disqualification on the basis of the special examination of June 20, 1967, and the failure to indicate why he was medically "not qualified".

On August 1, 1967, the Department of Personnel finalized the proposed disqualification and marked Brass disqualified for "failure to meet medical requirements".

Brass sent a letter dated August 6, 1967 to the Civil Service Commission headed: "Appeal of Disqualification By City Personnel Director". His grounds of appeal were that he had been found medically qualified on February 7, 1967; he was still medically qualified; he had been discriminated against in being re-

quired to undergo a special reexamination; and no medical examination in fact ever took place on June 20, 1967. Brass also protested the absence of specifications of the medical requirements, failure to comply with which had resulted in his disqualification.

On August 14, 1967, the Commission, answering Brass' letter through its secretary, informed him that his appeal could not be considered unless it was accompanied by "independent competent medical evidence as to your qualification."

On August 15, 1967, defendant Solomon Hoberman, City Personnel Director and Chairman of the City Civil Service Commission wrote Brass as follows:

"The Department of Personnel records indicate that you were marked not qualified for this position by our psychiatrist because of a history of homosexuality.

"It is our policy to disqualify homosexuals for employment as Case Workers, Hospital Care Investigators, and Children's Counselors."

This policy statement of August 15, 1967 was repeated by Hoberman on September 5, 1967, in a letter to Brass, ostensibly in reply to a letter Brass had addressed to the Mayor.

On August 20, 1967, Brass submitted a revised appeal, asking that it supersede his appeal-letter dated August 6, 1967. This revised appeal was directed to the disqualification for the alleged history of homosexuality. Brass argued that such disqualification was discriminatory, arbitrary, capricious, and unreasonable because homosexuality bears no relationship to job performance, competence, suitability, or fitness. Brass also contended that, because the history of homosexuality was apparently based on charges made over four years prior thereto, those charges could not serve as the basis for a determination of present unsuitability. In addition, Brass took the position that mere charges did not prove that he was homosexual and that the

City, not he, must sustain the burden of proof.

On September 8, 1967, the secretary of the Civil Service Commission wrote Brass regarding his revised appeal of August 20, 1967, and reiterated that the appeal could not be entertained unless accompanied by "recent independent competent medical evidence" as to Brass' qualifications. Brass responded that he was appealing a policy question, not a medical one; and, thus, medical evidence was immaterial. Brass further stated that, even if the question of his alleged homosexuality was relevant, insofar as it is impossible to prove the negative fact that one is not a homosexual, the Commission had the onus of proving that in fact he was homosexual.

On October 25, 1967 the Commission notified Brass that they had denied his appeal.

*Administrative Proceedings concerning Teper*

Plaintiff Frederick Teper took and passed both written and medical examinations required for caseworker position on September 3, 1967. During the medical examination of that date, however, Teper was requested to submit the reasons for his Selective Service System classification 4–F.

On September 26, 1967, Teper submitted a letter from his Local Board stating the following medical reasons for his 4–F classification of March 17, 1964: "Myopia astigmatism and Homosexual Tendencies."

On October 5, 1967, a "Psychiatric Review" took place, apparently without the presence of Teper. Dr. Percy Mason concluded that Teper was not qualified because of " 'Homosexual tendencies' noted by Draft Board" which disqualify the applicant "as per paragraph 5:

'5. PSYCHONEUROSIS, emotional instability, sexual deviation, psychopathic personality or other marked personality disorder.' "

On October 30, 1967, Teper was informed that he was being marked "not

qualified" "as per psychiatric examination."

On November 7, 1967, Teper requested another examination. This was conducted by Dr. Antonio Bottino on November 27, 1967. Dr. Bottino also concluded that Teper was not qualified; and, on December 18, 1967, Teper was. so informed.

### The Conflicting Affidavits and Confused Record before the Court

■ Plaintiffs seek the extraordinary remedy of a preliminary injunction. The burden is upon them to make a sufficient showing of relevant facts and to draw the Court's attention to the salient legal principles which, when considered together by the Court, disclose a reasonable probability of the success of plaintiffs' contentions at trial. See, e. g., Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., 299 F. 2d 33 (2d Cir. 1962); Garland v. Ruskin, 249 F.Supp. 977, 981 (S.D.N.Y.1965); Nadya, Inc. v. Majestic Metal Specialties, Inc., 127 F.Supp. 467 (S.D.N.Y. 1954).

■ Though it is not necessary, in an action charging denial of constitutional rights, to make a showing of irreparable harm to plaintiffs, Henry v. Greenville Airport Commission, 284 F.2d 631 (4th Cir. 1960), the facts upon which plaintiffs base their right to relief must be essentially undisputed or appear with such substantial clarity that the Court can weigh and determine the probability of success. See, e. g., Cement Enamel Development, Inc. v. Cement Enamel of New York, Inc., 186 F.Supp. 803 (S.D. N.Y.1960); Heyman v. A. R. Winarick, Inc., 166 F.Supp. 880 (S.D.N.Y.1958); American Radiator & Standard Sanitary Corp. v. Sunbeam Corp., 125 F.Supp. 839 (S.D.N.Y.1954).

■ On the record in its present condition, the Court concludes that it cannot make reasonably certain findings of fact, which are crucial to determining the question of interlocutory relief, in the absence of an evidentiary hearing that may resolve inconsistencies, clarify ambiguities, and give the Court the opportunity to hear viva voce those who have submitted conflicting affidavits regarding certain key events.

Defendants do not contest the proposition that a blanket policy excluding homosexuals as a class from city employment would be arbitrary, capricious and hence unconstitutional. See Defendants' Memorandum of Law in Opposition at 5. Their position is, however, that such a policy (presumably even one of complete exclusion) would not be unconstitutional when it is restricted to a few selected positions, such as caseworker, because with respect to such positions, the policy is not unjustified or arbitrary but rather has a reasonable basis in recognized and accepted medical and psychiatric belief.

A blanket exclusionary policy, even when applied to a few selected positions, is, according to plaintiffs, unconstitutional because it is unduly discriminatory. Plaintiffs challenge the reasonableness of such a policy if indeed premised on medical opinion, by questioning the validity of the basis of the "belief." In this connection, plaintiffs urge that belief which is not based on empirical data showing some nearly absolute correlation renders the policy arbitrary and unconstitutional.

To support the reasonableness of their policy, defendants have offered the affidavit of Dr. Percy Mason, a psychiatrist. He states that the position of caseworker demands "a tremendous amount of interpersonal involvements with the clients and prospective clients of the Department." (Mason Affidavit, August 21, 1968, ¶ 4). A caseworker is said to be closely involved with the "intimate personal problems and family relationships of his clients which he must mediate, and in some instances direct, possibly finding solutions and remedies." (Id.) As such, a caseworker must be emotionally mature and stable. Dr. Mason states:

"My professional experience in the field of psychiatry, as well as the ex-

perience of my colleagues in this field, has demonstrated that the homosexual has psychologically failed to achieve this degree of maturity. This immaturity places him at a disadvantage in dealing with the problems of others. The homosexual cannot divorce himself from his own problems and is not socially mature enough so as to be capable of giving advice and making decisions in areas dealing with the personal and inter-personal relationships of others. This immature personality structure pervades all of the areas of functioning of the homosexual to such an extent that his ability to properly assist others in their personal problems is seriously weakened." (Mason Affidavit, ¶ 5).

John L. Costa, Acting Commissioner of the New York City Department of Social Services, has submitted an affidavit in which he avers that it is the opinion of his department that the hiring of homosexuals for the caseworker position would be detrimental to the interests of the Department and its clients because he is advised that "homosexuals commonly are obsessed with their sexual desires, are commonly compulsive in expressing these desires and would not be able to communicate or relate normally or effectively with welfare recipients or employers of the Department." (Costa Affidavit, August 20, 1968, ¶ 3).

Plaintiffs seek support in the affidavit of Fritz A. Fluckiger, Ph.D., a certified psychologist engaged in the practice of psychotherapy; the letter of Evelyn Hooker, Ph.D., Research Psychologist at U.C.L.A.; and in various medical and psychiatric journals and texts.

Dr. Fluckiger admits that "[s]ome theorists and practitioners in the helping professions have claimed youthful and especially adult homosexual activity is symptomatic of pervasive personality disturbance." (Fluckiger Affidavit, September 9, 1968, ¶ 6). Nonetheless, he asserts that this is merely a stereotype of "the homosexual," and that no methodologically garnered evidence supports the proposition that all persons engaged in homosexual activities exhibit these characteristics alluded to by Dr. Mason and Commissioner Costa. Indeed, Dr. Fluckiger claims that research has shown that they are not indeed universally exhibited by persons engaging in homosexual activity and can even be found in persons engaging solely in heterosexual activity. (Id.). It is apparently Dr. Fluckiger's view that only a personalized and comprehensive examination of an individual can disclose and establish whether or not the characteristics ascribed to homosexuals generally by Dr. Mason and Commissioner Costa are present in the particular case.

Dr. Hooker, in a brief letter to Mr. Levine, counsel for plaintiffs, replies to Dr. Mason's affidavit summarily by stating that, contrary to the Mason affidavit, she finds that "some homosexuals are emotionally mature individuals and are quite capable of giving advice and making decisions in areas dealing with the personal and interpersonal relationships of others. Male homosexuals as a group are very heterogeneous in their personality characteristics and patterns of adjustment. While some are emotionally immature and would not qualify for the position of case worker, other [sic] would qualify. Homosexuality *per se* should not disqualify an individual for the position of social case worker. Each individual must be judged on his merits." (Plaintiff's Reply Memorandum of Law, Appendix I).

Plaintiffs' memoranda cite miscellaneous sources which, when distilled, stand for the proposition that homosexuals cannot be stereotyped and that the term "homosexual" itself has become meaningless in light of recent studies of general sexual behavior.

The foregoing discussion makes it evident that the issue of whether homosexuals may be treated as an absolute class constitutionally and barred from the caseworker position cannot be resolved on the paper record now before the Court. The record in its present condition is singularly inappropriate to de-

cide questions that are of fundamental importance to these particular litigants and that may have far-ranging implications in the general field of public personnel administration.

There should be a full-scale inquiry to determine the existence of statistical or other scientifically valid bases for absolute disqualification. Expert testimony (subject to cross-examination) concerning the reasons, pro and con, with respect to defendants' belief in some form of absolute disqualification may amplify and illuminate, if not harmonize, the apparently conflicting opinions.

Even if the Court were to conclude that a policy of complete exclusion of homosexuals from the position of caseworker is constitutionally invalid, the Court would still be confronted with the question of whether such a policy is, in fact, being utilized; or, if no definitive policy existed, whether, in reality, such an absolute bar has resulted from the absence of any meaningful procedure to distinguish between the vocationally competent and incompetent homosexual.

Hoberman's letter of August 15, 1967 to Brass appears to be an authoritative statement of Personnel Department policy. It reads as if it were the pronouncement of an absolute rule. Yet, it is sufficiently ambiguous especially in light of later formulations, to invite most suggestively Hoberman's live testimony on the issue.

On November 6, 1967, Commissioner Samorodin of the City Civil Service Commission wrote Mr. Levine, plaintiffs' counsel, that "[a]n active, practicing homosexual generally will not be marked qualified for a position as a Case Worker in the Department of Social Services, * * *." The word "generally" was emphasized in defendants' supplemental memorandum of law. Dr. Antonio Bottino, a psychiatrist employed by the Civil Service Commission states that he has "qualified admitted homosexuals for the position of Case Worker." (Bottino Affidavit, September 20, 1968, ¶ 5). Thus, it is possible that there is no clear, authoritative statement of municipal policy. Nor, on the face of the record can the Court definitively conclude that any such practice exists in the absence of policy.

But the Court is disturbed by the seeming inconsistency between Dr. Bottino's affidavit and the reports he filed after examining plaintiffs which evidence the apparent application of automatic disqualification.

So, too, Dr. Bottino's affidavit may conflict with that of Dr. Mason. Apparently Dr. Mason's view is that homosexuals, as a class, are incapable of performing adequately the services of a caseworker. Thus, it is likely that Dr. Mason would not pursue the exhaustive procedures that Dr. Bottino states he follows because the Mason approach would regard these procedures as unnecessary.

Moreover, Dr. Bottino's statement— that he has, in "many cases," "qualified admitted homosexuals for the position of Case Worker" (Bottino Affidavit, ¶ 5) when they had "performed well during their probationary periods with the City" —appears logically inconsistent with Hoberman's letter of July 15, 1967 to Brass or even Commissioner Samorodin's letter of November 6, 1967, which would not indicate that a probationary period was given, or that there were many admitted homosexuals now employed as caseworkers. If this was the case, plaintiffs' suit charging discrimination against homosexuals as a class would seem devoid of factual merit.

■ We now turn to the question of procedural due process. Plaintiffs claim that, even if an absolute policy of exclusion was constitutionally permissible, their disqualification was unjustified because Teper was found to have "homosexual tendencies" and Brass "a history of homosexuality" in a summary and capricious manner—findings predicated basically upon charges made long ago by a federal agency or upon a Selective Service System determination made years past, without defendants' inquiry into the truth or accuracy of the charges

or determination when made or their current validity.

Plaintiffs' second procedural due process argument is directed to the ultimate finding of "not qualified" because of homosexuality, the existence of which, theoretically, either is not disputed or is determined after an investigation which satisfies due process criteria. Plaintiffs' position is that a disqualification grounded on homosexuality may be determined constitutionally only after a psychiatric or other medical examination establishes that the particular applicant's homosexuality will indeed prove materially detrimental to and preclude the competent performance by him of services as a caseworker.

The examinations given them, plaintiffs argue, could not have produced evidence or information which supports a finding of current homosexuality or a history of homosexuality or homosexual tendencies; nor could such examinations supply the medical basis for an administrative determination that Brass and Teper could not satisfactorily perform their duties as caseworkers.

Brass' affidavit details his recollection of the entire examination, which is set out in full in the margin.*

Teper's affidavit states that he was asked only four questions at his examination:

"He first asked why I had been rejected by the Army, to which I explained that this resulted from some dreams which I had recounted to an Army doctor four years before. The other three questions were whether I had ever participated in any homosexual conduct, whether I lived with my parents, and whether I was married. I answered no to each." Teper Affidavit, July 19, 1968, ¶ 2.

Dr. Bottino was the psychiatrist who conducted both examinations. Defendants have proffered his affidavit on the subject of the examinations. However, it does not appear that Dr. Bottino has any specific recollection of the particular examinations nor does he dispute the plaintiffs' statements of what occurred. The Bottino affidavit describes the procedure that he says he usually follows, and that he states he pursued here.

However, his filed reports do not detail any of the questions or answers that he regards as highly important. On the contrary, they tend to confirm plaintiffs' recollection of the examinations.

On this matter Dr. Bottino should be heard fully and his testimony given *ore tenus* before the Court makes findings and conclusions. His affidavit may be incomplete; and, perhaps, he may be in a position to explain why his reports were couched in conclusory language.

On the other hand, plaintiffs may, on cross-examination, be able to elicit testimony corroborative of their own statements. Similarly, defendants, upon cross-examination of plaintiffs, may impeach plaintiffs' current version of the facts. Manifestly, this critical factual issue should be resolved only after a plenary evidential hearing.

■ Under Rule 65(a) (2) of the Federal Rules of Civil Procedure the Court may order the trial of the action on the merits to be advanced and consolidated with the hearing on the applica-

* "Q. Are you presently employed by the City?
A. No.
Q. Were you ever in the Armed Services?
A. Yes, I was in the Army.
Q. For how long?
A. Two years.
Q. How did you get along?
A. As well as anybody else.
Q. I mean, was your discharge honorable?
A. Yes.

Q. What other jobs have you held previously?
A. Barclays Bank, the Department of Commerce, and Cornell University.
Q. What did you do at Cornell?
A. Accounting.
Q. I guess that the Department of Commerce is what they mean by previous public employment.
A. Yes, that's it.
Q. Well, that's about all for now."
Brass Affidavit, July 19, 1968, ¶2.

tion for a preliminary injunction. Because this case raises constitutional questions of a substantial nature having potentially wide impact upon public administration, it should be tried at an early date.

Moreover, all of the issues which must be litigated in order to issue or deny a preliminary injunction are involved with the claim for permanent relief.

Delay in the trial of this case for discovery or inspection does not seem necessary or appropriate. Copies of all papers in defendants' files relating to plaintiffs have apparently been supplied to plaintiffs and the Court. There is no discernible reason why any of the parties would desire to take depositions or utilize other discovery devices.

Accordingly, the Court hereby advances the trial of the action on the merits and consolidates it with the hearing of the application for the preliminary injunction. The Court will meet with counsel for the purpose of formulating a pretrial order and setting an early trial date.

So ordered.