John Jerome BRUNS, III,

v.

Donald D. POMERLEAU, Individually and as Commissioner, Baltimore City Police Department, and Ralph G. Murdy, Individually and as Deputy Commissioner, Administrative Bureau, Baltimore City Police Department.

Civ. A. No. 21035.

United States District Court,
D. Maryland.

Oct. 20, 1970.

Joseph H. H. Kaplan and John Henry Lewin, Jr., Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Md., and Bernard L. Silbert, Asst. Atty. Gen. of Md., for defendants.

Robert C. Verderaime and Verderaime & DuBois, Baltimore, Md., for Ralph G. Murdy.

NORTHROP, Chief Judge.

The plaintiff, a practicing nudist, has brought his complaint against the defendants pursuant to Title 42, U.S.C.A. Section 1983—"Civil Rights Act"—on the ground that the defendants wrong-fully refused to accept the plaintiff's application for employment as a probationary patrolman and that such refusal was tantamount to a violation of the plaintiff's civil rights, as guaranteed by the First, Fifth and Fourteenth Amendments of the United States Constitution.

Plaintiff makes a blanket assertion that the State does not have the power to compel the surrender of constitutional rights as a condition to public employment. He alleges that the action on the part of the defendants in excluding him from consideration for the Baltimore City Police Department was arbitrary, capricious and without just cause or justification. He further contends that the defendants knowingly violated Maryland law when they disapproved plaintiff's application under the "Omnibus Act"— Laws 1966, Chapter 203, Section 535 (A) and (B), which established the procedures for determining the eligibility for probationary patrolmen.[1]

Plaintiff maintains that the only criteria under Maryland law for determining the eligibility of probationary patrolmen is whether the individual passed the Civil Service written examination. This contention may be disposed of by pointing out that the procedure followed by the police department in reference to employment applications, as will appear more fully below, is in conformity with and not in violation of the provisions of the "Omnibus Act."

The criteria established by the Commissioner of Police and by the Civil Service Commission is designed to allow the Commissioner to employ certain pro-

---

1. The Omnibus Act, § 535(A) and (B) reads as follows:

(A) The Examining Authority shall ascertain the relative qualifications for all candidates for appointment at the entrance level to the department * * * by competitive examinations and such other tests as in its judgment may be necessary. * * * The examining authority shall prepare graded lists of qualified candidates determined from the written examinations and other tests established by the examining authority.

(B) Appointments at the entrance level. Those applicants for appointment to the Department at the entrance level who possess the minimum qualifications and meet the other eligibility criteria established by the Commissioner after consultation with examining authority, as determined by the tests and procedures administered pursuant to Subsection A shall be included on an eligible list * * *. The eligibility lists shall at all times be open to the inspection of the public and the examination papers and other material used in determining an applicant's eligibility shall be open to inspection of the Commissioner * * * or the applicant.

cedures, such as investigation, personal contacts, etc., after the threshold written examination is administered by the Civil Service Commission. The policy of the police department is to accept as a probationary patrolman any applicant who passed the written examination given by the Civil Service Commission and who passed the personal interview. The test to qualify for this position of probationary patrolman is thus not limited solely to the successful completion of the written examination, but rather to the passing of all requirements established by both authorities.

■ Subsequent to the completion of these tests, an investigation in depth of the probationary patrolman is conducted, and if the applicant fails to meet the standards of that examination (consisting of neighborhood interviews and a complete scrutiny of his background as to criminal involvement, etc.) then his probationary status is terminated. No psychological test is conducted by either the Civil Service Commission or by the Department. Because of the unique nature of a policeman's duties, it is the finding of this court that it is contemplated and, indeed, is necessary, that such a procedure for recruitment be followed. It is the judgment of this court, therefore, that there was no violation of the Act in regard to the recruitment procedures employed by both the Commission and the Department.

The policeman's job in this day is a sensitive one, and his character, behavior and associations must be subjected to careful scrutiny by those trained in police work. There were two hundred positions to be filled for probationary patrolman when plaintiff applied and the recruitment process was tailored, as it necessarily should have been, to fill those positions as expeditiously as possible. Plaintiff has attempted to place upon the so-called "Omnibus Act" a narrow construction, contending that the police department has no rights in reference to employment. This assuredly cannot be the case, for applications for such a position must be subject to investigation by the police department itself and the competence and fitness of the applicant thoroughly explored.

■ In order to hold the defendant Commissioner Pomerleau individually liable it would be necessary for plaintiff to establish that he acted outside his scope of authority, as granted by the Omnibus Act, so that his actions could be said to be his own, rather than imputed to the State. His conduct would have to be more than plain negligence to establish liability. A showing of wilfulness or wantonness on his part is needed to take his actions outside the protective covering of his official office. The defendant testified that he considered his actions as falling under his authority to establish the "other eligibility criteria" as provided for in § 535(B). This refusal to accept the plaintiff's application was a policy decision formulated within the discretionary authority granted the Commissioner by the Act. He believed that the best interests of the police department dictated that a nudist not be hired to the position of probationary patrolman. From the facts stipulated to by the parties and the facts developed at trial, this court finds that the Police Commissioner did not act maliciously or wantonly, but acted within the confines of the "Omnibus Act." The record clearly reflects that the defendant, Commissioner Pomerleau, arrived at this policy after extensive sifting of what he considered to be controlling factors. Inasmuch as the evidence indicates that defendant Pomerleau was acting officially and for the Department, the action against him individually will be dismissed, and the action against Ralph G. Murdy, individually and as Deputy Commissioner will also be dismissed. Likewise, no award of damages, either compensatory or punitive, will be granted, since there has not been a showing of such wilfulness or wantonness of conduct as would justify such an award.

Although defendant Pomerleau acted within the scope of his authority so that he cannot be personally held accountable, there remains the request for declara-

tory relief that his actions as an agent for the state were arbitrary and capricious, and it is to this issue that this court's opinion is now directed. In a case of this dimension, perfect justice, as always, is an illusory concept. Viable equities exist on both sides, and it is the duty of a court of justice, insofar as humanly possible, to find a just and proper balance and reach a result which will do minimal violence to existing concepts.

It is conceded that plaintiff stood first of the sixty applicants for the two hundred positions of probationary patrolman, both in the written and in the preliminary interview examinations, and that no derogatory information was turned up by the in-depth investigation. It is stipulated by both parties that there was no reason for his exclusion, other than the fact that he was a nudist. Other stipulations and testimony developed the following facts: That the plaintiff, having been successful on his Civil Service written examination, scoring a 46.750, the highest grade of his class, was called by the police department and requested to file an application; that the plaintiff informed his caller that he wished to have a personal interview with the recruiting sergeant regarding certain personal matters prior to filing a formal application; that an appointment was arranged and plaintiff went to the Department and met with a Sergeant Baronela; at the meeting plaintiff informed Sergeant Baronela that he and his wife and family were members of an organization known as Pine Tree Associates, Inc., a nudist club. Plaintiff inquired whether that fact standing alone would disqualify him from appointment to the position of probationary patrolman, for if it would, he would like to know prior to submitting himself to further examinations and procedures. About a week later plaintiff called the Department and spoke with Sergeant C. Opolko, who informed him that he was familiar with the situation, and advised him to go ahead and submit a formal application. This plaintiff did on March 27, 1968, and a note appeared thereon "Applicant requests complete background check before final interview." This complete background check was usually conducted during the probationary period. Plaintiff took his physical examination on March 27, 1968, and was found physically acceptable. On April 5, 1968, plaintiff returned to the Department and attended a personal interview conducted by Major Lon F. Rowlett, Director of the Personnel Division, Baltimore City Police Department, Lieutenant John J. Cunningham and Sergeant C. Opolko. Plaintiff passed that interview with an accumulative mathematical score of 46.-000. His total mark, thereafter, including his written examination, was a 92.-750, placing him at the top of the list of those persons who had applied for the two hundred vacancies. An investigation in depth was subsequently conducted and the ultimate report indicated the following:

Disregarding the applicant and his family being Nudists, they would be considered normal average people. We have been unable to develop anything of a derogatory nature, with this one exception.

The applicant is NOT RECOMMENDED.

1. Despite the applicant being frank and discussing his being a Nudist, it is felt that the Department and he would possibly be subjected to public criticism as Nudism is not accepted in normal society.

2. The possibility of being harassed by fellow members of the Department would make his position intolerable.

3. Questionable performance of duty where his views may differ in vice control work. (lewd shows, indecent exposure, etc.) Nudists are of the opinion that exposing any part of the body is not improper providing that the motive behind the exposure is not of a pornographic nature.

4. Nude photographs exhibited in nationally sold magazines would certainly distort the Department's image.

The applicant will not withdraw his membership with the Nudist Club. He did state, if requested by this Department, he would not allow his family or himself be photographed nude where the photographs would be made available to the public.

An inter-agency memorandum indicated that inquiry was made of the Assistant Attorney General of Maryland who assisted with matters pertaining to the police department, regarding plaintiff's application, in which it was pointed out: "Since there are no other disqualifications for Mr. Bruns, it would appear that the judgment as to his employment by the Baltimore Police Department will rest solely on his avowed membership in the Pine Tree Associates, a nudist club."

Subsequent to the written examination and interviews, plaintiff's wife was interviewed, as were his associates, and all matters checked out that were obtained from these investigations. This in-depth investigation of plaintiff disclosed that he was well-liked and respected among his neighbors and by his employers. It further revealed that the Pine Tree Associates, at Crownsville, Maryland, had a good reputation in that community and had never been the source of any complaint whatsoever. There was a rigidly enforced rule forbidding alcoholic beverages or an intoxicated person on the premises, and unmarried persons were not normally accepted as members. The membership included an Army General, an Air Force Colonel, teachers and federal employees, as well as a policeman from the District of Columbia and a policeman from the Baltimore City Police Department. Investigation further disclosed that the latter person had been with the Department for a considerable period of time and no complaints had ever been received concerning his activities or those of his wife. Nothing was developed during this investigation in reference to plaintiff's behavorial background which would otherwise have excluded him from becoming a policeman.

Commissioner Pomerleau ultimately determined, after reviewing the various memoranda, that the policy of the Department would be that no practicing nudist would be considered eligible for employment as a probationary patrolman, regardless of the fact that he was otherwise well qualified. Commissioner Pomerleau testified before this court that he had made that policy decision and, for his reasons, stated that: (1) Nudism is not generally accepted as a way of life by the general public and (2) Because of this, a nudist might possibly subject police officers in general and the Department in particular to public criticism; (3) A nudist would possibly be harassed by fellow members of the Department making his position intolerable; (4) He possibly could not perform his duties where his views might differ in vice control work, such as with lewd shows, indecent exposure, etc., because of a nudist's belief that nudism is not improper, providing the motive behind exposure is not of a pornographic nature; (5) The feeling that a nudist could have a psychological impediment which would inhibit his proper performance under certain circumstances; and (6) He further felt that being a nudist might have an adverse effect upon his testimony in any given instance, especially before a jury during a court proceeding.

He testified that a policeman has an extremely sensitive job, and that there has been difficulty recently in recruiting individuals because of the nature of the work and the considerable magnitude of recent problems in law enforcement. He therefore decided that he could not afford to experiment with an individual who did not conform to what might be considered normal socially acceptable activities. It is difficult, he went on to say, to maintain mutual and public regard for law enforcement officials of any kind. He therefore concluded that

the policy against employing nudists on a probationary basis was necessary as a measure for maintaining discipline and morale on the force as well as creating a publicly acceptable image. No evidence was produced to sustain these contentions, however, other than his personal proclivities and the fact that he had taken this matter up with police commissioners of other large metropolitan cities, who agreed with his point of view.

An article appearing in the New York Times on September 6, 1970, entitled "A New Look at the Police" by William V. Shannon, would tend to substantiate the Commissioner in many respects, particularly as to the difficulties encountered in recruitment and the changing nature of police work in general. One interesting comment he makes in comparing policemen in this country to those in Britain might be said to have some bearing on the question before us. He alludes to the fact that in Britain, where the police are more respected than here, they are not burdened with enforcing laws that are unenforceable—having reference to gambling, prostitution and vice in general. He goes on further to say: "By contrast, in the United States we have translated everybody's private moral standards into law from the Methodists on liquor to the Catholics on abortion."

Recently, however, some states have undertaken a review of their laws dealing with moral relationships between consenting adults. *See generally,* Fisher, The Sex Offender Provisions of the Proposed New Maryland Criminal Code: Should Private, Consenting Adult Homosexual Behavior Be Excluded?, 30 Md. L.Rev. 91 (1970). As was stated in the Wolfenden Report (1956):

> Unless a deliberate attempt is to be made by society, acting through the agency of the law, to equate the sphere of crime with that of sin, there must remain a realm of private morality and immorality which is, in brief and crude terms, not the law's business. To say this is not to condone or encourage private immorality. On the contrary, to emphasize the personal and private nature of moral or immoral conduct is to emphasize the personal and private responsibility of the individual for his own actions, and that is a responsibility which a mature agent can properly be expected to carry for himself without the threat of punishment from the law. *Id.* at 48.

This article is one of a number reflecting a new look at certain laws difficult to enforce.[2] So it would seem that there is indeed a changing attitude in this country toward policing morality where consenting adults are involved.

There is no question but that now there is a different test of one's constitutional right to public employment than that announced by Justice Holmes in McAuliffe v. Mayor, etc., of City of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892), when he said (speaking for the Massachusetts Supreme Judicial Court), (o)ne "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."

---

2. *See e. g.,* Fisher, The Legacy of Freud—A Dilemma for Handling Offenders in General and Sex Offenders in Particular, 40 U.Colo.L.Rev. 242 (1968); Kadish, The Crisis of Overcriminalization, 374 Annals 157 (1967); R. Slovenko, Sexual Behavior and the Law (1965); Gardiner, The Purposes of Criminal Punishment, 21 Modern L.Rev. 117 (1958). In a recent article by Richard Taffe, Jr., titled Women are Behind Criminals in Various Phases of Involvement, published in The Daily Record, October 19, 1970, Miss Ward E. Murphy, who is in charge of five state institutions and the Division of Probation and Parole in Maine, is quoted as saying:

> I think the day is coming when only those offenses which are against an individual, property * * * or the country, will be offenses.
>
> Such things as alcoholism, morals offenses, or anywhere where you're superimposing a moral standard, will perhaps come out of the chain of illegal offenses and move into a medical or social misbehavior status.

*Id.* at 220, 29 N.E. at 517. The efficacy of this statement has been eroded by subsequent court decisions in which the "right-privilege" distinction has been narrowed to forbid a state the power to compel the surrender of constitutional rights as a condition of public employment. *See, e. g.,* Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). See generally, Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L.Rev. 1439 (1968); Note, First Amendment and Public Employees—An Emerging Constitutional Right to be a Policeman? 37 G.W.L.Rev. 409 (1968); Note, The First Amendment and Public Employees: Time Marches on., 57 Geo. L.J. 134 (1968). "(T)he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." 385 U.S. at 605–606, 87 S.Ct. at 685, 17 L.Ed.2d at 639. While a State may not impose unnecessary or unwarranted restrictions upon an applicant for public employment, there can be no doubt of the right of the State to investigate the competence and fitness of those whom it hires to enforce its laws.

■ The State has broad powers in the selection and discharge of its employees. Where the individual to be hired will be the trustee of the public interest bearing the burden of great and total responsibility to his public employer, it is imperative that only the most qualified individuals be selected. While a private employer may have the right, in the absence of statute or contract, to refuse to hire an individual for personal reasons, unrelated to job function, such as length of hair or personal dislike, an individual's interest in government employment is recognized as entitled to constitutional protection. *Wieman, supra;* United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

■■ It may be that no one has a right to secure or maintain public employment. But the fact that one may not have a legal right to get or keep a government post does not mean that he can be adjudged ineligible illegally, arbitrarily, or capriciously. In determining whom to admit or whom to continue in public employment, the government may not classify individuals as eligible or ineligible where the basis of such classification is "arbitrary or discriminatory." "To state that a person does not have a constitutional right to government employment is only to say that he must comply with reasonable, lawful, and nondiscriminatory terms laid down by the proper authorities." Slochower v. Board of Higher Educ., 350 U.S. 551, 555, 76 S.Ct. 637, 639, 100 L. Ed. 692 (1956).

■ The Supreme Court has left little doubt that the right of association is specifically encompassed and protected by the First Amendment. *E. g.,* Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L. Ed.2d 1488 (1958). *See generally,* Emerson, Freedom of Association and Freedom of Expression, 74 Yale L.J. 1 (1964). The First and Fourteenth Amendments protect this right to associate with any person of one's choosing for the purpose of advocating and promoting legitimate, albeit controversial, political, social or economic views. *See* Pollard v. Roberts, 283 F.Supp. 248 (E.D. Ark.), aff'd 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968).

■ By limiting the power of the states to interfere with freedom of speech and freedom of association, the Fourteenth Amendment protects all

persons, no matter what their views or means of expression. It is too late in the day to doubt that this freedom of association extends only to political or conventional associations and not to the social or the unorthodox. A nudist has the benefit of this constitutional right to associate with other nudists when his actions are in conformity with valid state statutes. This is a right of constitutional stature that a state may not condition by the exaction of a price. The power of a state to infringe upon this First Amendment right must be so circumscribed as not, in attaining a permissible end, to unduly infringe upon the protected freedom. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). In order to justify a state's infringement, the state has the burden of showing a compelling or sufficiently important governmental interest to justify the intrusion upon the constitutional right. No showing merely of a rational relationship to some colorable state interest will suffice when a constitutional right is involved. It is "(o)nly the gravest abuses, endangering paramount interests, (that) give occasion for permissible limitation." Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945), rehearing denied, 323 U.S. 819, 65 S.Ct. 557, 89 L.Ed. 630 (1945). As was stated in United States v. O'Brien:

> To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest.

391 U.S. 367, 376–377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

The interference with the right does not have to be direct, as with a prohibitory law or regulation, but can be indirect. By either method, the evil is the same. Freedom of association is no more subject to arbitrary state curtailment than any other constitutional right. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Shelton, supra; Gilmore v. James, 274 F.Supp. 75 (N.D. Tex.1967), aff'd 389 U.S. 572, 88 S.Ct. 695, 19 L.Ed.2d 783, rehearing denied, 390 U.S. 975, 88 S.Ct. 1027, 19 L.Ed.2d 1195 (1968). It is the failure of defendant Pomerleau, as Commissioner of the Baltimore City Police Department, to establish a sufficiently compelling governmental interest in excluding the plaintiff from becoming a probationary patrolman, solely because of his being a practicing nudist, that we find an unconstitutional infringement upon plaintiff's rights.

As was set forth above, under the "Omnibus Act" the Commissioner of Police is authorized to establish such "other eligibility criteria" to test the fitness of the candidates to discharge their duties as patrolmen. While on its face this grant of power appears to be absolute, a strict literal reading of this grant would render this provision unconstitutional. Obviously, the Maryland Legislature recognized that a police officer holds a position of public trust, and in that respect, his conduct must be of a higher moral character than that of the ordinary citizen. See Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). But this grant to the Commissioner does not empower him to use this authority arbitrarily. It is conceded by both parties that this court would have no trouble in finding for the plaintiff if it was shown that the defendant systematically excluded all Republicans, Jews or Negroes, or required that all patrolmen attend Mass or take an active part in missionary work. See United Public Workers, supra. Is it any less a derogation of plaintiff's right to

exclude him solely because he is a nudist, without having shown some nexus between his activity and a paramount governmental interest? This court thinks not.

Neither the plaintiff nor the defendants have introduced any evidence relative to the general public attitude toward nudism. It is conceded that there are a number of camps located across the United States where interested families and persons may go, in an unobtrusive manner; to practice recreational activities in the nude. There is no indication that the plaintiff would attempt to procure other adherents to his views in the police department making such solicitation disruptive of departmental operations. While the testimony reveals a policeman is, in effect, on duty twenty-four hours a day, seven days a week, and must at all times have his weapon on his person, it is a matter of common knowledge that in participating in other recreational activities, when not nude, the weapon is not always so available. To literally enforce this rule would prevent a member of the police force from participating in any swimming or water activity and for that matter, any vigorous physical activity or sport. The unavailability of such a weapon to a person taking recreation as a nudist cannot be seriously considered a valid reason for one's rejection.

No evidence was introduced at any point in the proceedings as to the effect the practice of nudism would have upon the carrying out of the plaintiff's police duties, or of the possible detriment to the Police Department, except for the bare allegations listed above. The mere allegation of a compelling state interest cannot be invoked as a talismanic incantation to support any exercise of power brought within its ambit. Quite the contrary. Where a First Amendment right is involved, only upon a showing of clear and convincing proof of the necessity of state interference will the infringement be upheld.

The defendant Pomerleau admitted that there is currently a member of Pine Tree Associates on the police force and that there was no record that his association hindered him in the performance of his duties or that his membership brought adverse or detrimental publicity to the department. The defendant's contention that plaintiff and the department would possibly be subjected to public criticism is not, standing alone, a valid reason for infringing upon one's constitutional right. The Constitution protects the unorthodox views as well as the orthodox. In Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L. Ed.2d 1512 (1960), the United States Supreme Court, in upholding the right to show the movie "Lady Chatterley's Lover," a motion picture depicting adultery, said:

> It is contended that the State's action was justified because the motion picture attractively portrays a relationship which is contrary to the moral standards, the religious precepts, and the legal code of its citizenry. This argument misconceives what it is that the Constitution protects. *Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority.* It protects advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax. And in the realm of ideas it protects expression which is eloquent no less than that which is unconvincing. *Id.* at 688, 79 S.Ct. at 1365, 3 L.Ed.2d at 1515. (emphasis added).

The freedom guaranteed by the First and Fourteenth Amendments has never been held to be wholly unconditional or absolute so that they can be utilized by the participant in any manner he deems appropriate. It is axiomatic that the claim of these freedoms cannot be a cloak to illegal conduct that is designed to abuse these freedoms. However, they are not conditioned upon and may not be construed to have been abused by the presence or absence of majority endorsement of the views or ideas for the promulgation of which freedom is claimed or sanctions are sought.

This court has uniformly held that nudism *per se* is not immoral or obscene. United States v. 25,000 Magazines, Entitled "Revue", 254 F.Supp. 1014 (D.Md.), aff'd *sub nom.*, United States v. Central Magazine Sales (Ltd.), 381 F.2d 821 (4th Cir. 1966); United States v. 1,000 Copies of Magazine Entitled "Solis", 254 F.Supp. 595 (D.Md. 1966). There is hardly an art museum or gallery to which one can go where completely nude statues and pictures are not on constant and prominent exhibition. Many popular books and magazines, far too numerous to list, frequently publish human nudity without offending the law. Nudism may be unappealing and unattractive to some people. It may be repulsive and vulgar to others. But that does not limit its right to constitutional protection. Whether or not it appeals to or repels an individual's sensitivities is irrelevant when a court is bound to apply First Amendment rights which do not incorporate such subjective standards.

Plaintiff's activities at Pine Tree Associates in no way intrudes upon the public's sensibilities. He is a member of a group whose activities are neither illegal nor immoral and which are carried on unobtrusively. The group has a good reputation in the community. The record reveals the plaintiff's behavior to be above reproach in his employment and in his neighborhood.

To condition one's employment upon the relinquishment of his constitutional right is an unwarranted and illegal intrusion upon that fundamental right that will serve as a "chilling effect" upon the exercise of other rights as well as a deterrent upon others in exercising this same right. *Cf.* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The reprisal here of forbidding employment to the plaintiff because he is a nudist will have the effect of stifling others from undertaking the valid exercise of this right. An individual will be hesitant in practicing nudism once he is aware that the avenue of employment as a member of the Baltimore City Police Department is closed. As defendant Pomerleau testified, no nudist would be hired on the police force. Such an arbitrary exclusion is inconsistent with Constitutional guarantees.

While the Constitution protects against invasions of individual rights and arbitrary exclusions, it does not withdraw from the Government the power to safeguard its vital interests. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). But these vital interests must be clearly stated with the requisite proof required to support an invasion of constitutional freedoms. It is a difficult task to arrive at a balance between the interests of the State and of the rights guaranteed all individuals. But the difficulty of this task does not allow a court to impede the exercise of guaranteed rights unless there is a clear showing of an over-riding compelling state interest. To hold less would be for the guarantees embedded in the Constitution to be manipulated out of existence. Frost & Frost Trucking Co. v. Ry. Comm'n, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926).

It cannot be denied that the behavioral pattern of a policeman off duty as well as on is of paramount interest to the Department. His associations are limited by his law enforcement employment. But it can only be limited to such associations or off duty activities that affect his morals and integrity or are inimical to the Department. What he does in his private life, as with other public employees, should not be his employer's concern unless it can be shown to affect in some degree his efficiency in the performance of his duties. There is nothing in the record before us to show that plaintiff's association would be inimical to his work or the Department. To deny his application consideration solely because of the defendant's bare allegations, without more, is to engage in speculation and presumptions. Constitutional freedoms cannot be limited on such hollow arguments.

Two recent Supreme Court decisions dealing with governmental intrusion upon First Amendment rights reasserted the rule that these rights can be limited only by the compelling proof of an over-riding state interest. In United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), the Court held that a section of the Subversive Activities Control Act making it unlawful for a member of the communist party to work in "any defense facility" was unconstitutional as it tended to establish guilt by association in violation of the First and Fifth Amendments. Is the arbitrary exclusion of all nudists from the Baltimore City Police force any less guilt by association?

In Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the board of education of an Illinois high school district dismissed a teacher for writing and publishing in a newspaper a letter critical both of the board's conduct in allocation of funds and of its nondisclosure of the true reasons additional tax revenues were being sought for the schools. At a hearing, the board found the statements to be false and determined that the statements were detrimental to the efficient operation of the schools. The Court held that teachers may not be constitutionally compelled to relinquish the First Amendment rights they would otherwise have enjoyed as nonteachers. If it is true that the right to political involvement and comment on matters of public concern does not cease upon the assuming of a governmental position, it is no less true for the expression of non-political, unorthodox but lawful conduct or association where the First Amendment draws no such restrictive lines.

This decision today is consistent with the recent Maryland case of Brukiewa v. Police Comm'r of Baltimore City, 257 Md. 36, 263 A.2d 210 (1970). Brukiewa, a police officer, was president of the local policeman's union and was suspended from the Baltimore force for making televised statements criticizing the current police administration and stating that morale had never been so low. The court held that the First Amendment barred disciplining the officer by suspension where there was no actual showing that the working harmony or general efficiency of the department had been disrupted or that public confidence was undermined. Tracing the Supreme Court's decisions from McAuliffe to Pickering, the Court of Appeals of Maryland concluded that, regardless of the status of the right-privilege distinction as applied to government employment, the police commissioner could not suspend the officer for exercising his right of free speech, a right not vitiated by the fact that what was said was critical of his superiors.

Notwithstanding the defendant Pomerleau's allegations, plaintiff's association with a nudist camp cannot cause any more departmental embarrassment than Brukiewa's statements; and further, where such lawful association can in no way conflict or interfere with his proper functioning as a police officer, plaintiff's First Amendment rights should be protected to the same extent as were those of Brukiewa.

To reiterate, plaintiff's private, non-political association with those who espouse nudism should be no less protected than associations of a political nature. "(P)olicemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967); Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970). They, like other public employees, enjoy the protection of the First Amendment. We do not hold that nudity may never be cause for refusal or dismissal of a public employee. Nor do we conclude that potential embarrassment from an employee's private conduct may in no circumstances affect the efficiency of his service. But where there is nothing to indicate that plaintiff is unqualified or incompetent to carry out the duties the job entails, he cannot be summarily excluded from consideration. This is not to say that plaintiff has a

constitutional right to be a policeman. The State has broad powers in the selection and discharge of its employees and it may be found that plaintiff's views will prevent him from effectively carrying out his responsibilities. But until this is shown, neither he nor any other nudist can be constitutionally excluded from consideration as a probationary patrolman, particularly since his conduct will be under observation for two years.

While this appears to be the first time a court has considered a case where an individual is precluded from acquiring government employment because he is a nudist, courts have considered before this an individual's moral life as it relates to his employment. The relationship of a homosexual to his public employment has been the subject of continuing debate. Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969); Scott v. Macy, 121 U.S.App.D.C. 205, 349 F.2d 182 (1965); McConnell v. Anderson, 316 F. Supp. 809 (D.Minn.1970); Brass v. Hoberman, 295 F.Supp. 358 (S.D.N.Y. 1968). Homosexuals have often been excluded from work of a classified nature, because they may be susceptible to coercion and pressure to reveal secrets as the price for silence. *See* Dew v. Halaby, 115 U.S.App.D.C. 171, 317 F.2d 582 (1963), petition for cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 550 (1964). But there is no danger here that plaintiff would be susceptible to coercion or blackmail for his nudist activities. The evidence here is quite to the contrary. It was he who disclosed his membership in Pine Tree Associates prior to his filing a formal application. At no time did he exhibit any secretiveness or in any manner indicate that he had any emotional hang-up concerning his association. And while there is much argument and some validity apparently to the question of instability in reference to homosexuals, there has been absolutely nothing to indicate any psycological defect insofar as the practice of nudism is concerned. The due process clause prevents one from being denied the possibility of public employment in this instance upon such an arbitrary basis.

This court, by its decision today, does not purport to encourage the propagandization of nudism in the community. It is not this court's function to determine legal issues by applying as standards its personal proclivities. But it is this court's function to insure unto each individual the maximazation of his constitutional rights.

It is therefore the opinion of this court that defendant Pomerleau has failed to show by clear and convincing evidence such a paramount governmental interest as would justify an intrusion upon plaintiff's First Amendment right, and his policy of total exclusion of all nudists is arbitrary and capricious. Unless by an appropriate interdepartmental order, the Commissioner of the Baltimore City Police Department restores the eligibility of plaintiff and like persons to become probationary patrolmen within seven days, counsel will submit an order of injunction.

All other relief is denied.

Each party is to bear his own costs.