Frances FISHER, Plaintiff,

v.

James SNYDER et al., Defendants.

No. CV72-L-200.

United States District Court,
D. Nebraska.

Aug. 10, 1972.

Theodore L. Kessner, Lincoln, Neb., for plaintiff.

Charles Baskins, North Platte, Neb., for defendants.

MEMORANDUM OF DECISION

URBOM, Chief Judge.

Frances Fisher is a schoolteacher whose teaching contract was declared terminated at the close of the contract period, May 19, 1972, because of conduct deemed by her employer to be "unbecoming a teacher."

A complaint under the Civil Rights Act was filed on May 24, 1972. Jurisdiction of this court properly is invoked under 28 U.S.C. § 1343. At the close of a hearing in this court on the plaintiff's motion for a preliminary injunction on May 31, 1972, all counsel stipulated that the case could be considered submitted on its merits. Accordingly, the defendants' request for designation of North Platte, Nebraska, as the place for trial is deemed abandoned.

The facts in this case are not seriously in dispute, although the inferences from them are. Frances Fisher is the holder of a teacher's certificate valid for more than one year, including the year 1972–1973. She was employed by the Board of Education of McPherson County High School District, McPherson County, Nebraska, as a teacher during the two years 1970–1972 in the public high school at Tryon, Nebraska. On April 5, 1972, she received notice that her contract would be terminated on May 19, 1972. On April 10, pursuant to § 79–1254 Nebraska R.R.S.1943, as amended,[1] Mrs. Fisher requested a hearing before the board of education and such a hearing was held on April 19. At a regular meeting of the board of education on May 8, 1972, a resolution was adopted, finding that the contract of Mrs. Fisher should be terminated at the close of the 1972 contract period, May 19, 1972, based on the following findings by the board:

"(a) Frances A. Fish [sic] is a single woman.

(b) That on several occasions during the current school year men, not related to . . . Frances A. Fisher, stayed in her apartment in Tryon, McPherson County, Nebraska, on several occasions ranging from one night to a period of at least one week, this constitutes conduct unbecoming a teacher.

(c) That there is no evidence to support the reason contained in the notice: '(b) failure to maintain discipline in 'classes' which purported clause should be and is hereby dismissed."

A transcript of the hearing before the board of education is in evidence here. If there be any factual justification for the contract termination, it must be found there. From it is learned that Frances Fisher, a divorcee, lives alone in an apartment located in a converted school building at Tryon. A kitchen, a bathroom, a bedroom, and a livingroom comprise the apartment. Mrs. Fisher, whose age is not shown by the record, has one son, who is 26 years of age, is married, and teaches school in the neighboring town of Stapleton, Nebraska. From time to time young ladies, married couples, and young men, who are friends

1. The statute provides:

"  . . . Any contract of employment between an administrator or a teacher who holds a certificate which is valid for a term of more than one year and a Class I, II, III, or VI district shall be deemed renewed and shall remain in full force and effect until a majority of the members of the board vote on or before May 15 to amend or to terminate the contract at the close of the contract period; *Provided*, that the secretary of the board shall, not later than April 15, notify each administrator or teacher in writing of any conditions of unsatisfactory performance or other conditions because of a reduction in staff members or change of leave of absence policies of the board of education which the board considers may be cause to either terminate or amend the contract for the ensuing school year. Any teacher or administrator so notified shall have the right to file within five days of receipt of such notice a written request with the board of education for a hearing before the board. Upon receipt of such request the board shall order the hearing to be held within ten days, and shall give written notice of the time and place of the hearing to the teacher or administrator. At the hearing evidence shall be presented in support of the reasons given for considering termination or amendment of the contract, and the teacher or administrator shall be permitted to produce evidence relating thereto. . . . "

of her son and friends of hers, visited Mrs. Fisher at her apartment and spent varying amounts of time, usually staying overnight. Cliff Rowan, age 27, whose parents live in California, who attends Chadron State College in Chadron, Nebraska, and who is described by Mrs. Fisher as her "son No. 2", visits her each vacation period. Additionally, he stayed a week with Mrs. Fisher in her apartment approximately a month before the hearing. Mrs. Fisher had gained permission of the school superintendent for Rowan to do at Tryon his student observing of teaching for a college course. She introduced Rowan to the students and others, and his visitation was reported in the newspaper. On a previous occasion, about a year before the hearing, Mrs. Brady, an Avon lady and wife of a local minister, called on Mrs. Fisher at about 8:30 on a Saturday morning. Mrs. Brady thought that she got Mrs. Fisher out of bed. Later a young man, Cliff Rowan, emerged from the bedroom and the three sat at the table in the kitchen, talking and drinking coffee. Mrs. Brady did not go all the way into the living room, where a davenport was, and she testified that she did not see any bedding on the davenport. Whether she saw the davenport on that occasion is not revealed.

■ When viewed most favorably from the position of the board of education and taking every permissible inference from the testimony elicited at the hearing, there is simply no proof of impropriety in Mrs. Fisher's conduct which affected her classroom performance, her relationship with students under her care, or otherwise had any bearing on any interest possessed by the board of education. At most, the evidence may be said to raise a question of Mrs. Fisher's good judgment in her personal affairs, when measured against an undefined standard which someone could suppose exists in a small town in Nebraska. I am constrained to hold that that was not enough to justify termination of the contract.

## I.

The due process clause of the Fourteenth Amendment to the Constitution of the United States incorporates the First Amendment, thereby prohibiting every state from "abridging . . . the right of the people peaceably to assemble . . ." DeJonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937). It makes no difference "whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958).

This is not to say that a board of education, as an arm of the state, can never make inquiry into the personal associations of a teacher. "Fitness for teaching depends on a broad range of factors." Beilan v. Board of Public Education, School District of Philadelphia, 357 U.S. 399, 406, 78 S.Ct. 1317, 1322, 2 L. Ed.2d 1414 (1958). But making inquiry is different from using impermissible inferences arising from the inquiry. Compare Beilan v. Board of Public Education, School District of Philadelphia, supra, with Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957). The present case is not one of refusal of the teacher to answer an inquiry, but use by the board of education of impermissible inferences arising solely from the fact of association by the teacher with other persons.

That teachers have a right of association has been expressly recognized in Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), and the court there declared that the right is "closely allied to freedom of speech and . . .

which, like free speech, lies at the foundation of a free society."[2]

Although most of the cases which have dealt with the constitutional right to freedom of association for teachers have been cases involving membership in organizations, I find no relevant distinction between that type of associational interest and that asserted by Mrs. Fisher. It is to be recalled that nothing more was shown by the evidence before the school board than the mere fact of association itself; there was no permissible inference of immorality. On that point I think the following language from Elfbrandt v. Russell, 384 U.S. 11, 17, 86 S.Ct. 1238, 1241, 16 L.Ed.2d 321 (1966), is instructive:

"Those who join an organization but do not share its unlawful purposes and who do not participate in its unlawful activities surely pose no threat, either as citizens or as public employees."

That does not end the controversy, however, because the *degree* of protection this right of association or assembly is to be given in the face of countervailing interests of the board of education must be determined. I shall postpone that discussion until Section III of this memorandum of decision.

## II.

Also protected by the due process clause of the Fourteenth Amendment is the right of privacy—the right to be let alone. It emerges from specific guarantees of the First, Third, Fourth, and Fifth Amendments or from the broad Ninth Amendment. See Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Black v. Cothren, 316 F.Supp. 468 (U.S.D.C.Neb. 1970). In *Griswold* the Supreme Court in discussing the right of privacy said:

"In NAACP v. Alabama, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488, we

---

2. The legislative history of the adoption of the amendment specifically preserving the right of assembly, while not extensive, supports the conclusion that the right was considered significant. When the House of Representatives went into session as a committee of the whole on the proposed amendments Mr. Sedgwick of Massachusetts argued against including the right of assembly, saying that if people freely conversed together, assembling for that purpose is a self-evident, inalienable right which the people possess and which never would be called into question. He therefore argued that it would be derogatory to the dignity of the House to include such "minutiae", whereupon he moved to strike out the words "assemble and."

Mr. Page responded:
". . . [P]eople have . . . been prevented from assembling together on their lawful occasions, therefore it is well to guard against such stretches of authority, by inserting the privilege in the declaration of rights. If the people could be deprived of the power of assembling under any pretext whatsoever, they might be deprived of every other privilege contained in the clause."

Shortly thereafter the question was put upon the motion to strike and "lost by a considerable majority." 2 Schwartz,

The Bill of Rights: A Documentary History, pp. 1090–1091.

Mr. Justice Douglas, speaking for the court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, declares that "The association of people is not mentioned in the Constitution nor in the Bill of Rights." He noted that in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488, it was said that freedom of association is a peripheral First Amendment right and that cases such as NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405, and Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, involved "more than the 'right of assembly' . . . The right of 'association,' like the right of belief . . ., is more than the right to attend a meeting; it includes the right to express one's attitude or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful." But in the context of the present case, where a form of expression seems not to be involved, it seems to me that the right of association is the right of assembly.

protected the 'freedom to associate and privacy in one's associations, noting that freedom of association was a peripheral First Amendment right . . . In other words, the First Amendment has a penumbra where privacy is protected from governmental intrusion. In like context, we have protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members. NAACP v. Button, 371 U.S. 415, 430–431, 83 S.Ct. 328, 336–337, 9 L.Ed.2d 405. In Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, we held it not permissible to bar a lawyer from practice, because he had once been a member of the Communist Party. The man's 'association with that Party' was not shown to be 'anything more than a political faith in a political party' . . . and was not action of a kind proving bad moral character. . . ."

■ I conclude that the association of persons within one's home is an activity constitutionally protected within the meaning of the right of privacy.

### III.

■ An impingement of a constitutionally protected right occurs when a board of education terminates a teacher's contract solely because of the teacher's exercise of that constitutional right. "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' . . . Such interference with constitutional rights is impermissible." Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Even if the plaintiff has *no contractual or tenure right to re-employment*, that fact, taken alone, does not defeat this proposition. Perry v. Sindermann, supra.

However, impingement of constitutional rights does not mean automatically that the impingement was unjustified. Even restraint of speech by government is not inevitably proscribed. In Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the court observed that the First Amendment means what it says in stating that the states may not abridge the right of free speech, and the court then stated, "We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances." The touchstone for testing the "carefully restricted circumstances" was described in *Tinker* as follows:

". . . There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students.

\*      \*      \*      \*      \*      \*

"The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression . . . .

"In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.

Burnside v. Byars, *supra*, [5 Cir.] 363 F.2d [744] at 749.

"In the present case, the District Court made no such finding, and our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students."

■ Similarly, to justify a dampening of the rights of assembly or association and privacy the state in the present case must show that the termination of the teacher's contract was caused by conduct which "materially and substantially" interfered with the school's work or rights of students, and "undifferentiated fear or apprehension" of such interference is not enough. In the present case the state has failed to show any actual interference by Mrs. Fisher's conduct with any interest of the state in its educational endeavors. Not as much as a single student or teacher or administrator—or even townsperson—came forward with evidence that Mrs. Fisher's associations had affected any relationship she had with any student, any teacher, or any administrator. Her effectiveness as a teacher, disciplinarian, or counsellor stands without factual challenge. It is the lack of any factual, as contrasted with imagined or theoretical, connection between Mrs. Fisher's association and a substantial weakening of the educational enterprise conducted by the board of education that must result in a finding that the termination of the contract was not constitutionally justified.

### IV.

■ The relief requested is injunctive and compensatory. No evidence of monetary loss has been presented, and I conclude that injunctive relief, voiding the purported termination of the contract and directing reinstatement is sufficient.