Julianna McKENNA and Alice Brown, Plaintiffs,

v.

PEEKSKILL HOUSING AUTHORITY, M. George Habeeb, Individually and in his capacity as a consultant to the Peekskill Housing Authority, Cyrus A. Bleakley, Individually and his capacity as Chairman of the Members of the Authority, and John E. Daly, Individually and in his capacity as Housing Manager of the Authority, Defendants.

78 Civ. 4993 (CHT).

United States District Court,
S. D. New York.

Sept. 17, 1980.

ing Authority (the "Authority"). The defendants in this suit are the Authority; M. George Habeeb, former Housing Manager of the Authority, individually and in his capacity as consultant to the Authority; Cyrus A. Bleakley, individually and in his capacity as Chairman of the Authority; and John E. Daly, individually and in his capacity as current Housing Manager of the Authority. The plaintiffs are challenging the Authority's visitors rule ("Rule 5") which requires tenants to obtain prior approval for overnight guests and to register their visitors' arrivals and departures with the project's management office. This Rule, they argue, unconstitutionally infringes upon their rights of privacy and free association. Plaintiffs have moved for summary judgment, seeking a declaratory judgment that Rule 5 is unconstitutional, a permanent injunction against its enforcement, and damages for personal injuries. The plaintiffs have raised important questions of constitutional law, but the Court is constrained to deny the plaintiffs' motion for summary judgment and to grant summary judgment in favor of the defendants on both the privacy and associational claims.

## BACKGROUND

The Court need not dwell on the case's background which has already been described in a prior Opinion denying class action certification. 83 F.R.D. 600 (S.D.N.Y.1979). Rule 5 of the Authority's "Rules and Regulations for Tenants" provides as follows:

### 5. ROOMERS, BOARDERS, LODGERS OR VISITORS

No person is permitted to occupy the premises except those duly registered in the Management Office and those listed on the dwelling application.

At times you may desire overnight or weekend visits of friends or relatives. This matter should be discussed with the Management. No reasonable requests will be refused; however, you must register your visitor in the Management Office Register and show therein time of his or her arrival and departure. Overnight

Westchester Legal Services, Inc., White Plains, N. Y., for plaintiffs; Andrew L. Levy, John T. Hand, Judith A. Kaufman, White Plains, N. Y., of counsel.

Peter B. Nickles, Peekskill, N. Y., for defendants.

## OPINION

TENNEY, District Judge.

Plaintiffs Julianna McKenna and Alice Brown are tenants in a state-funded housing project operated by the Peekskill Hous-

guests who cannot be reported to the office because of emergency or late arrival must be reported the next business day. Failure to comply with the above may subject the tenant to eviction proceedings.

Every tenant is provided with a copy of the Rules, for which he or she must provide a signed receipt, see Plaintiffs' Appendix to Motion for Summary Judgment ("Plaintiffs' Appendix") at A–6, and tenants are bound to obey the Rules as part of the rental agreement, *id.* at A–5. According to the Authority, however, no tenant has ever been evicted for noncompliance with Rule 5.

As described in the Court's earlier Opinion, 83 F.R.D. at 601–02, both plaintiffs were at various times contacted by defendant Habeeb acting in his former capacity as Housing Manager. He complained of facts which, if true, would constitute violations of Rule 5, and he reminded them that the Authority can seek eviction as a method of enforcing the Rule. The plaintiffs allege that the Rule's existence and Mr. Habeeb's contacts have caused fear, anxiety, embarrassment, and a chilling effect on their constitutional rights in preventing them from relating freely with their friends and relatives.

## DISCUSSION

*Summary Judgment*

■ Federal Rule of Civil Procedure ("Rule") 56 provides that summary judgment may be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this Circuit, "the 'fundamental maxim' remains that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975); *Morse v. Swank*, 459 F.Supp. 660, 664 (S.D.N.Y.1978). "On a motion for summary judgment . . . the inferences drawn from the facts before the court must be viewed in the light most favorable to the party opposing the mo-

tion." *Fournier v. Canadian Pac. R. R.*, 512 F.2d 317, 318 (2d Cir. 1975). "If, when so viewed, reasonable men might reach different conclusions, the motion should be denied and the case tried on its merits." *Empire Elec. Co. v. United States*, 311 F.2d 175, 180 (2d Cir. 1962). Although "[c]onstitutional and other questions of a large public import should not be decided on an inadequate factual basis," 6 Moore's Federal Practice ¶ 56.17[10], at 56–772 (2d ed. 1976), "summary judgment may be rendered . . . where the record is adequate for the constitutional question presented and there is no genuine issue of material fact." *Id.* at 56–772 to 776. *See, e. g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Gotkin v. Miller*, 514 F.2d 125 (2d Cir. 1975); *Beal v. Lindsay*, 468 F.2d 287 (2d Cir. 1972). In addition, even though Rule 56 does not address whether summary judgment may be granted in favor of a non–moving party, "[t]he great weight of authority . . . dispenses with the formality of a cross–motion." 6 Moore's, *supra*, ¶ 56.12, at 56–332; *Morrissey v. Curran*, 423 F.2d 393 (2d Cir. 1970); *Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp.*, 372 F.Supp. 503 (S.D.N.Y.1974). The one concern in granting summary judgment to the opposing party is that the movant be given an adequate opportunity to "adduce factual material which raises a substantial question of the veracity or completeness" of the other side's case. *Beal v. Lindsay, supra*, 468 F.2d at 291.

The facts in this case regarding Rule 5's potential interference with the plaintiffs' constitutional rights and their actual reactions to it are not in dispute. At most, a trial would focus on whether the Authority's Housing Manager telephoned the plaintiffs in enforcing the Rule, and if he did, what transpired. But determining these facts would not throw any new light on the legal issues raised by this case. It has been well established that the Authority does warn tenants about violating Rule 5 and that tenants are aware of the Rule when

planning their affairs. Substantiating the exact extent to which the plaintiffs actually changed their behavior will not affect the Court's resolution of the constitutional questions properly posed by this suit. As the issues are now framed, they can be dealt with summarily. Moreover, both sides have had an adequate opportunity to present factual material. "[T]here is nothing whatever to indicate that any party was at all prejudiced." *Morrissey v. Curran, supra,* 423 F.2d at 399.

*First Amendment Claims*

Plaintiffs argue that Rule 5 violates the First Amendment in several ways: (1) by chilling their exercise of the right to associate freely; (2) by subjecting their associations to prior restraints and to vague discretionary standards of review; (3) by imposing an unconstitutional condition on their continued occupancy in publicly supported housing; and (4) by failing to meet the standard for justifiably infringing on constitutional rights because the Rule "does not even serve a rational purpose, no less a compelling purpose." Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Memorandum") at 29. None of these claims is borne out, however. To the extent that the Rule has altered their behavior, either their reactions were unwarranted, or the intrusion was justified by the state's compelling interests in maintaining safe, decent housing and in keeping track of occupancy and eligibility in public housing.

The First Amendment protects "the freedom of speech [and] . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Supreme Court "has repeatedly held that rights of association are within the ambit of the constitutional protections afforded by the First and Fourteenth Amendments." *Gibson v. Florida Legislative Comm.,* 372 U.S. 539, 543, 83 S.Ct. 889, 892, 9 L.Ed.2d 929 (1963). In addition, the Court is especially vigilant in vindicating these "fundamental and highly prized" rights, *id.* at 544, 83 S.Ct. at 892, for they "need breathing space to survive."

*NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). "Freedoms such as these are protected not only against heavy–handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). For example, the Supreme Court has invalidated registration requirements for labor organizers, *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); struck down compelled disclosure of membership lists, *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); overturned convictions based upon vague ordinances which impose prior restraints on expression, *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); and enjoined the publication of disparaging political labels placed on designated groups by the Attorney General acting without a hearing, *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). In addition, when First Amendment rights are involved, the Supreme Court has found as "an essential prerequisite to the validity of an investigation . . . that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." *Gibson v. Florida Legislative Comm., supra,* 372 U.S. at 546, 83 S.Ct. at 894. And "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be . . . achieved . . . [by a] less drastic means." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

At the core of the First Amendment lies political expression and advocacy, that is, "freedom of association for the purpose of advancing ideas and airing grievances," *Bates v. City of Little Rock, supra,* 361 U.S. at 523, 80 S.Ct. at 416, "particularly where a group espouses dissident beliefs." *NAACP v. Alabama, supra,* 357 U.S. at 462, 78 S.Ct. at 1172; *see Shelton v. Tucker, supra; Thomas v. Collins, supra.* But First

Amendment protections are not limited to politics. As the Supreme Court said in *NAACP v. Alabama*: "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters," 357 U.S. at 460, 78 S.Ct. at 1171. *See Thomas v. Collins*, 323 U.S. at 531, 65 S.Ct. at 323 (rejecting "[t]he idea ... that the First Amendment's safeguards are wholly inapplicable to business or economic activity.") As one particularly pertinent example, in *Holt v. Richmond Redev. and Hous. Auth.*, 266 F.Supp. 397 (E.D.Va.1966), the court enjoined eviction proceedings against a tenant whose "lease was terminated because he was organizing the tenants, because he was exercising his First Amendment rights." *Id.* at 400.

More recent cases have properly recognized that the First Amendment also applies to social and personal associations, including those which do not purport to express and advocate ideas. For example, in *Tyson v. New York City Hous. Auth.*, 369 F.Supp. 513 (S.D.N.Y.1974), Judge Metzner held that public housing tenants had a cause of action under the right of association when they were threatened with eviction because of acts committed by adult children who did not live with them. As Judge Metzner explained:

> The nub of this claim is that by declaring these tenants ineligible for continued occupancy on the basis of their children's acts, the defendants have acted "solely from the fact of association" by the plaintiffs with their children.... Such a claim, if proven, would run afoul of the First Amendment which guarantees to every person the right to freely associate with others, including members of his family.

*Id.* at 520. Similarly, in *Fisher v. Snyder*, 346 F.Supp. 396 (D.Neb.1972), *aff'd*, 476 F.2d 375 (8th Cir. 1973), a public school teacher was reinstated because her termination, based on "conduct unbecoming a teacher," resulted from having male friends of the family as overnight guests. The court stated that:

> Although most of the cases which have dealt with the constitutional right to freedom of association have been cases involving membership in organizations, I find no relevant distinction between that type of associational interest and that asserted by Mrs. Fisher. It is to be recalled that nothing more was shown by the evidence before the school board than the mere fact of association itself; there was no permissible inference of immorality.

346 F.Supp. at 399. A third case, *Bruns v. Pomerleau*, 319 F.Supp. 58 (D.Md.1970), enjoined a police department from refusing to employ an otherwise qualified employee solely because he and his family belonged to a nudist society. The court refused to accept the notion that "freedom of association extends only to political or conventional associations and not to the social or the unorthodox." *Id.* at 65. Arguably, members of a nudist society might intend to convey, expressly or impliedly, a message about certain values, but the *Bruns* court found no indication that the applicant intended to proselytize about his recreational preferences; only his association with others was in question.

■ This Court agrees that the First Amendment's protection for freedom of association extends to private and social associations, even when the aggregation of persons has no hortatory purpose. At base, the First Amendment is concerned with the unfettered development of matters of conscience. "The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). Simply because a group, or even a pair, of persons has not distilled the fruits of their relationship into a body of thought or into a political programme, government interference with their interaction nonetheless implicates the First Amendment. Just as vocal, assertive people invoke the Constitution to safeguard their freedom of expression, silent people should be able to invoke it to protect their silence.

■ On the other hand, freedom of association is not absolute. Regulations will be upheld if the state justifies its intrusions by showing a compelling governmental interest that cannot be served by less drastic means. "[R]egardless of the label applied, be it 'nexus,' 'foundation,' or whatever," *Gibson v. Florida Legislative Comm., supra,* 372 U.S. at 546, 83 S.Ct. at 893, the state must first demonstrate an adequate connection between its intrusion and its legitimate interests, and must then show that the means adopted are the least restrictive in light of the interests served. In the context of personal relationships, the state bears this burden just as it does when political associations are threatened or intruded upon. For example, in the cases discussed above, the courts conceded that the state as employer has legitimate reasons for inquiring about its employees' and applicants' fitness for state jobs. *Fisher, supra,* 346 F.Supp. at 398; *Bruns, supra,* 319 F.Supp. at 67. Nevertheless, they invalidated the government's *use* of the information because of the impermissible implications drawn from inadequate evidence.

By the same token, the Authority has legitimate and substantial reasons for inquiring about who is visiting and residing at its housing projects. The Authority is charged by the state with the obligation of maintaining safe, decent housing and of ensuring the fiscal integrity of the projects, including the occupancy, eligibility, and rentals of the tenants.[1] Unlike *Fisher* and *Bruns, supra,* this case presents no abuse of any information obtained. Certainly, Rule 5 would be susceptible to misuse–if, for example, the Authority denied requests for overnight guests on impermissible grounds, such as race, or religion, or political affilia-

tion, or if the Authority unjustifiably inquired into or publicized or tried to control the tenants' personal affairs. Similarly, if the state attempted to evict tenants on the basis of their guests' acts, the Authority might run afoul of *Tyson, supra.* But none of these possibilities has been alleged or suggested by the facts of this case, and the Court refuses to reach beyond the issues presented to address problems that may never arise.

The Court is sympathetic to the tenants' claims and sensitive to the delicate First Amendment questions posed, but the plaintiffs have not shown any infringement of their rights. The visitors rule is justified in principle, and the plaintiffs have not alleged any impermissible applications of the Rule.

Plaintiff McKenna has alleged that because of a letter from the Authority invoking the Rule, her adult daughter was unable to stay at her apartment during a period of convalescence, but Ms. McKenna never approached the Housing Manager about the matter, and there is no reason to presume that he would have denied her request, which seems eminently reasonable. Plaintiff Brown complains of a similar letter from the Housing Manager about overnight guests. But here again Ms. Brown made no attempt to seek permission for having guests. In all of the other incidents mentioned in their papers, the plaintiffs allege that they declined to invite guests to their homes or to provide them with overnight accommodations because of the Rule. In several instances, the plaintiffs asked their visitors to leave despite a late hour, and in one case, despite inclement weather, even

---

1. On the purposes of the Rule, see Deposition of John E. Daly, Housing Manager of the Authority, sworn to October 11, 1979, at 27, 35, 37, 44–45, 47–48, 50–52, 55.

Although the plaintiffs have provided a complete copy of Rule 5's text in the Appendix to their Memorandum in Support of Summary Judgment, Plaintiffs' Appendix at A–1, their Complaint and the Memorandum itself exclude the Rule's first sentence, which reads: "No person is permitted *to occupy* the premises except those duly registered in the Manage-

ment Office and those listed on the dwelling application." (Emphasis added). This omission minimizes the connection between Rule 5 and the Authority's legitimate interest–indeed, obligation–in knowing who "occupies" its projects as opposed to those who merely visit or stay overnight. While the Authority cannot intrude freely into its tenants' lives by simply coloring its probes as a check on occupancy, Rule 5's first sentence does convey the importance of the Authority's need for the Rule.

though the Rule itself provides an exception for "emergency or late arrival." If the Authority were constitutionally forbidden to make any inquiries whatsoever about the tenants' guests and visitors, then these facts by themselves might show a compensable injury. But when the Authority is permitted to inquire, and when the Rule and its administrative implementation suggest no violations of constitutional rights, the plaintiffs must point to more than the inconvenience or distastefulness of identifying their guests and seeking prior approval for overnight visitors in order to sustain their challenge.

In support of their First Amendment claims, the plaintiffs have also raised the doctrines of unconstitutional conditions and prior restraint, both of which can be disposed of quickly. The doctrine of unconstitutional conditions provides that the state cannot demand the nonassertion of constitutional rights in exchange for government benefits. *See generally* L. Tribe, American Constitutional Law § 10–8 (1978). Briefly put, the state cannot do indirectly, using the leverage of largesse, what it cannot do directly through regulation. But in this case, the Court has held that the Authority has shown an adequate justification for inquiring directly about visitors and overnight guests. In other words, to the extent the visitors rule is a condition of enjoying government–supported housing, it is not unconstitutional.

Challenges involving prior restraints generally arise when a governmental body is empowered to review the content of a speaker's message in advance of publication. *See, e. g., New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Similarly, because of their "chilling effects," otherwise legitimate regulations of time, manner, and place will be struck down if they lack a "narrow, objective, and definite standard to guide the licensing authority." *Shuttlesworth v. City of Birmingham, supra*, 394 U.S. at 151, 89 S.Ct. at 938. But here, there is no suggestion that the Hous-

ing Manager censors the tenants' choice of guests in any impermissible way, nor that the requirement of prior approval inhibits the plaintiffs' expressions and interchanges with their friends and relations. Moreover, the uncontroverted statements of the Authority's Housing Manager make clear that the standard of reasonableness is concerned only with matters well within the Authority's justified interest in safety and lawful occupancy of its projects. Plaintiffs' Memorandum at 6–7. By comparison, in *Shuttlesworth, supra*, the Supreme Court struck down a regulation allowing the City Commission to deny a parade license if it found "in its judgment [that] the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." 394 U.S. at 148–50, 89 S.Ct. at 938. No such breadth or generality is used in Rule 5, and the visitors rule portends no such infringement on the content of the tenants' relations.

*Privacy Claims*

Plaintiffs raise a series of privacy claims. They contend that Rule 5 "is an intrusion of plaintiffs' privacy of the same magnitude as a search of their homes and papers," Plaintiffs' Memorandum at 43; that the Rule is unjustified as an infringement "on choices concerning family living arrangements," *id.* at 40; and that the Rule is particularly heinous because it affects "the home as the situs of protected private activities," *id.* at 35. The Authority responds that the Rule does not violate any constitutional privacy rights and that any intrusions are justified.

The Supreme Court "has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe v. Wade, supra*, 410 U.S. at 152, 93 S.Ct. at 726; *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). But the constitutional concept of privacy is not coterminous with the colloquial meaning of privacy. The Court's decisions "make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Con-*

*necticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), are included in this guarantee." *Roe v. Wade, supra,* 410 U.S. at 152, 93 S.Ct. at 726. In addition, the right of privacy "is not unqualified and must be considered against important state interests in regulation." *Id.* at 154, 93 S.Ct. at 727.

Because of its flexible form, responsive to circumstances, the scope of the privacy right is difficult, if not impossible, to define, but its outlines can be sketched, its major elements identified. In *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), Justice Stevens wrote for a unanimous Court that:

> The cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

*Id.* at 598–600, 97 S.Ct. at 876 (footnotes omitted).[2] The plaintiffs have couched their challenge in terms of avoiding disclosure and making personal choices without interference. Neither of these theories, however, fits the facts of this case.[3] Even though the visitors rule touches on the home and the family, the Authority does not regulate the tenants' decisions about whom to live with, nor about whether to invite guests, nor about whom to invite, nor about how long they should be invited to stay. And to the extent that the tenants must make distasteful disclosures, the Authority's legitimate needs adequately justify its collecting the information, which has not been put to any impermissible uses so far as this record reveals.

It is well established that the home and the family are two protected zones of privacy. *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment); *Wisconsin v. Yoder,* 406 U.S. 205, 231–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972); *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). As a poignant illustration, the Supreme Court reached opposite results in two zoning cases because only non–related persons were affected in one, whereas in the other, members of a family would have been forbidden to live together. *Compare Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), *with Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

These decisions cannot be taken, however, to signify that any regulation of home or family is invalid. Even when a regulation touches on "that freedom of personal choice in matters of marriage and family life ... [that] is one of the liberties protected by the Due Process Clause," *Cleveland Board of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974), the Court still balances the individual's privacy against "the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of East Cleveland, supra,* 431 U.S. at 499, 97 S.Ct. at 1936; *Roe v. Wade, supra,* 410 U.S. at 154–55, 93 S.Ct. at 727.

---

2. Cited in a footnote, Professor Kurland of the University of Chicago Law School suggests that "[t]here are at least three facets that have been partially revealed, but their form and shape remain to be fully ascertained." *Id.* at 599 n. 24. Besides Justice Stevens' two categories, his third includes "the right of the individual to be free in his private affairs from governmental surveillance and intrusion," a bundle of rights directly protected by the Fourth Amendment. *Id.* Plaintiffs, however, have expressly declined to argue that the visitors rule constitutes a search. Plaintiffs' Memorandum at 43.

3. By adopting Justice Stevens' two categories as organizational guides, the Court does not wish to suggest that these are the only possible headings for privacy claims, nor that privacy claims must be stated in these terms to be actionable. Both Justice Stevens and Professor Kurland, *supra* note 2, qualified their observations with the phrase "at least." Federal courts will carefully examine and balance the interests in a properly presented privacy case, regardless of its novelty or its ability to fit under established rubrics.

Thus, the Court in *Moore* invoked the Due Process Clause to strike down East Cleveland's zoning ordinance not simply because it affected families, but because of its "tenuous relation" to the city's "legitimate goals" of "preventing overcrowding, minimizing traffic and parking congestion, and avoiding an undue burden on East Cleveland's school system." 431 U.S. at 499–500, 97 S.Ct. at 1936. Moreover in balancing private and governmental interests, the Supreme Court gives especially close scrutiny to regulations which dictate the permissible shape of citizens' personal affairs.[4]

Applying these principles to Rule 5, the Authority has not and does not threaten to use its visitors rule to control the tenants' choice about their living arrangements or visitors. Instead, the Authority's inquiries are limited to keeping track of the guests who have been chosen by the tenants. The Authority's purposes are to maintain safety and to monitor its projects' occupancy.[5] On this point, the plaintiffs have cited the case of *Messiah Baptist Hous. Dev. Fund Co. v. Rosser*, 92 Misc.2d 383, 400 N.Y.S.2d 306 (City Ct., Yonkers 1977). There, the trial court ruled that a visitor for two or three nights a week is "not an occupant in the sense of one who has taken possession or exercised dominion over the apartment or of a room thereof." 400 N.Y.S.2d at 308. But this case did not hold that an agency is constitutionally forbidden to inquire about visitors in order to determine eligibility and occupancy for government–supported housing.[6] To the contrary, the agency's decision about the meaning of "occupancy" may have been incorrect in *Messiah*,[7] but the inquiry was plainly legitimate. As stated in a case involving the joint federal and state program of Aid to Families with Dependent Children (AFDC):

> Inquiring whether a lodger's presence in fact indicates a diminished need for shelter assistance is hardly a violation of plaintiffs' rights. The constitutionally protected rights of free association and privacy do not compel the states to misallocate their scarce welfare resources. . . . Only if the challenged regulation sought to prescribe plaintiffs' familial or sexual life style, would the free association–privacy claim merit further consideration.

*Hurley v. Van Lare*, 380 F.Supp. 167 (E.D. & S.D.N.Y.1974) (three–judge court), *vacat-*

---

4. For example, in *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), the Supreme Court invalidated a provision in the federal food stamp program (denying benefits to households with non-related persons) as "wholly without any rational basis," *id.* at 538, 93 S.Ct. at 2827. In a footnote, Justice Brennan stated that

> [t]he Government initially argued to the District Court that the challenged classification might be justified as a means to foster "morality." In rejecting this contention, the District Court noted that "interpreting the amendment as an attempt to regulate morality would raise serious constitutional questions." [*Moreno v. U.S. Dept. of Agriculture*], 345 F.Supp. 310, 314 [D.D.C.1972].

413 U.S. at 535 n. 7, 93 S.Ct. at 2826.

5. See note 1 *supra*.

6. The plaintiffs have cited one other case which they suggest should influence the Court's decision. *Heritage Hills, Ltd. v. Smith*, No. 78–CVG–268 (Mun. Ct. of Chillicothe, Ross County, Ohio, 1978), discussed in Plaintiffs' Memorandum at 46-47. In this case, a visitors rule, similar to Rule 5, required tenants in federally-subsidized housing to report their overnight guests. In dismissing an eviction proceeding based in part on the visitors rule, the court found that the landlord failed to show any material non-compliance with the rental agreement, that there was no showing of "good cause" for eviction, and that the overnight guests rule was "unconscionable." But besides the factual distinction that eviction proceedings were actually begun in *Heritage Hills*, the court in its one–page memorandum did not explain the term "unconscionable," nor did it venture a judgment on the rule's constitutionality. For the reasons explained throughout this Opinion, the Court finds that Rule 5 is not "unconscionable" and that the right to privacy, an issue this Court must confront, is not violated.

7. Although Rule 5 contains similar language about who may "occupy" an apartment, the interpretation of this term is not before the Court, and therefore the Court intimates no view about the reasoning or conclusion in the *Messiah* case, except to note that official decisions affecting tenants in public housing may not be arbitrary or capricious. *See, e. g., Lopez v. Henry Phipps Plaza South, Inc.*, 498 F.2d 937 (2d Cir. 1974) (Friendly, J.).

ed on other grounds, 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975).[8]

In a series of AFDC cases,[9] federal courts have preferred to base their decisions on statutory rather than constitutional grounds, but when privacy claims were reached, the courts have held that the Constitution is not offended by reasonably narrow inquiries into personal information that is germane to the financial and administrative integrity of the state's benefits programs. E. g., Doe v. Norton, 365 F.Supp. 65 (D.Conn.1973), vacated on other grounds sub nom. Roe v. Norton, 422 U.S. 391, 95 S.Ct. 2221, 45 L.Ed.2d 268 (1975) (per curiam), on remand sub nom. Doe v. Maher, 414 F.Supp. 1368 (D.Conn.1976), vacated on other grounds, 432 U.S. 526, 97 S.Ct. 2474, 53 L.Ed.2d 534 (1977).[10] Indeed, the Supreme Court in Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), upheld a New York AFDC regulation which required recipients to allow visits by caseworkers, entering the home without a search warrant, as a condition of continued eligibility for benefits. Upon reviewing all the circumstances, the Court found that the regulation "does not descend to the level of unreasonableness ... which is the Fourth Amendment's standard." Writing for the majority, Justice Blackmun enumerated many factors influencing the Court, several of which are pertinent to the case at bar: (1) the state's obligation to the public in "assuring that the intended and proper objects of [its] tax–produced assistance are the ones who benefit from the aid it dispenses," id. at 318–19, 91 S.Ct. at 386; (2) the limitations and procedural protections

---

**8.** In Hurley and its companion case, Taylor v. Lavine, a three-judge court knocked down AFDC regulations which automatically reduced benefits if "lodgers" joined a recipient's household. These provisions were invalidated as irrebuttable presumptions in violation of the Due Process Clause. On appeal, however, the Supreme Court vacated the Due Process rulings, while reaching the same result because the Court found the regulation in conflict with the governing federal statute. The free association and privacy claims, rejected by the district court, were never mentioned in the Supreme Court's opinion.

**9.** E. g., Doe v. Swank, 332 F.Supp. 61 (N.D.Ill.), aff'd mem. sub nom. Weaver v. Doe, 404 U.S. 987, 92 S.Ct. 537, 30 L.Ed.2d 539 (1971); Taylor v. Martin, 330 F.Supp. 85 (N.D.Cal.), aff'd mem. sub nom. Carleson v. Taylor, 404 U.S. 980, 92 S.Ct. 446, 30 L.Ed.2d 364 (1971); Meyers v. Juras, 327 F.Supp. 759 (D.Or.), aff'd mem., 404 U.S. 803, 92 S.Ct. 91, 30 L.Ed.2d 39 (1971). Each of these decisions invalidated state regulations which required, as a condition of continued benefits, that unwed mothers assist in determining the father's identity and in enforcing his support obligations. These provisions were struck down as imposing impermissible additions to the federally mandated eligibility requirements.

**10.** In Doe v. Norton, changes in the federal implementing regulations made Connecticut's regulation no longer impermissible, thereby eliminating the statutory route for avoiding the constitutional issues. On the plaintiffs' privacy claim, the court held that, despite its proximity to the intimate realm of procreation and family, an inquiry about the father's identity was permissible and its scope was properly limited to the state's legitimate interests. The court explained:

> There is no intrusion into the home nor any participation in interpersonal decisions among its occupants... The statute does not forbid an unwed mother to have a man in the house or even in her bedroom.... The only restriction it imposes ... is that the father satisfy his legal obligation to support his own child and that the mother provide what information she possesses toward that end.

365 F.Supp. at 77–78.

After noting probable jurisdiction sub nom. Roe v. Norton, 415 U.S. 912, 94 S.Ct. 1406, 39 L.Ed.2d 466 (1975), the Supreme Court vacated and remanded for consideration of a statutory amendment allowing states, as a condition of eligibility, to require a mother's cooperation in establishing paternity. 422 U.S. 391, 95 S.Ct. 2221, 45 L.Ed.2d 268 (1975) (per curiam). On remand sub nom. Doe v. Maher, 414 F.Supp. 1368 (D.Conn.1976), the district court arrived at the same conclusions–namely, that Connecticut's regulations did not conflict with the federal statute and that the forced disclosure and cooperation did not violate any constitutional rights. Again, however, the Supreme Court vacated, 432 U.S. 526, 97 S.Ct. 2474, 53 L.Ed.2d 534 (1977), this time asking the district court to clarify the relation between the federal and state "good cause" standards under which unwed mothers might be exempted from the disclosure and cooperation requirement. The district court's rulings on the constitutional issues have never been overruled and, even though vacated, the reasoning of its opinions remains sound.

imposed by the regulations on the administrative agency, *id.* at 320–21, 91 S.Ct. at 386; and (3) the inadequacy of alternative sources of information about eligibility, *id.* at 322, 91 S.Ct. at 388. In short, the Court would not recognize

> the right to receive [benefits] upon [the citizen's] own informational terms, . . . . [thus] avoid[ing] questions of any kind . . . . Mrs. James has the "right" to refuse the home visit, but a consequence in the form of cessation of aid . . . flows from that refusal. The choice is entirely hers, and nothing of constitutional magnitude is involved.

*Id.* at 321–22, 324, 91 S.Ct. at 389. If not directly dispositive of the plaintiffs' claims, these cases reinforce the Court's conclusion that the Authority's rule is permissible.

### CONCLUSION

Although Rule 5 touches on several areas associated with privacy—family, home, living arrangements, personal contacts—the Rule's imposition on the plaintiffs' freedom of choice is slight, if it imposes at all, and the required disclosures, while inconvenient, do not amount to the sort of intrusion forbidden by the Constitution when considered in light of the state's legitimate needs. The Court is mindful of the threats to privacy posed by government inquiries and record-keeping, *see Whalen v. Roe, supra,* 429 U.S. at 605–06, 97 S.Ct. at 879; *id.* at 606–07, 97 S.Ct. at 879–80 (Brennan, J., concurring). But a facially valid, narrowly drawn regulation need not be struck down simply because of the abstract potential for abuse, which shows no signs of materializing according to the record before the Court.

If the tenants can show some actual infringement on their freedoms after Rule 5 has been applied, a different case will be presented. "The government as landlord is still the government[,] . . . subject to the requirements of due process of law." *Rudder v. United States,* 226 F.2d 51, 53 (D.C. Cir.1955). But as the plaintiffs' case now stands, they have shown neither actual infringement nor actionable "chilling effects" on their rights. The Court therefore grants summary judgment for the defendants on both the associational and privacy claims.

So ordered.